IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DANIEL G.,[1]

Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION,

Defendant.

Case No. 6:25-cv-02058-JR

OPINION AND ORDER

RUSSO, Magistrate Judge:

Plaintiff Daniel G. brings this action for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Title II Disability Insurance Benefits under the Social Security Act. For the reasons set forth below, the Commissioner's decision is affirmed, and this case is dismissed.

[1] In the interest of privacy, this opinion uses only the first name and initial of the last name of the non-governmental party.

## BACKGROUND

Born in February 1979, plaintiff alleges disability beginning January 1, 2020, due to post-traumatic stress disorder ("PTSD") and left knee pain. Tr. 195, 212, 214. His application was denied initially and upon reconsideration. On December 6, 2021, a hearing was held before an Administrative Law Judge ("ALJ"), wherein plaintiff was represented by counsel and testified, as did a vocational expert ("VE"). Tr. 26–76. On December 21, 2021, the ALJ issued a decision finding plaintiff not disabled. Tr. 13–22.

Plaintiff timely appealed and, on September 13, 2024, the Honorable Judge Kasubhai reversed the ALJ's decision and remanded the case for further proceedings. Tr. 1239–58; *see also* Tr. 1263–67 (Appeals Council remand order). In particular, Judge Kasubhai found that the ALJ erred in evaluating plaintiff's subjective symptom testimony. Tr. 1243–54.

On June 12, 2025, a second ALJ hearing was held, wherein plaintiff was again represented by counsel and testified, as did a VE. Tr. 1184–1212. On July 9, 2025, the ALJ issued a second decision finding plaintiff not disabled. Tr. 1165–76. Plaintiff then filed a complaint in this Court.

## THE ALJ'S FINDINGS

At step one of the five step sequential evaluation process, the ALJ found plaintiff "engaged in substantial gainful activity" from September 2024 to the present, but not before. Tr. 1167–68. The remainder of the ALJ's decision was therefore intended to address the period between the alleged onset date and August 2024 (plaintiff began engaging in work activity in June 2020, but that work either did not rise to substantial gainful levels or was accommodated).[2] *Id.* At step two, the ALJ determined the following impairments were medically determinable and severe: "post-

[2] Plaintiff does not seek a closed period of disability. *See, e.g.*, Tr. 1186–87; *see generally* Pl.'s Opening Br. (doc. 15).

traumatic stress disorder (PTSD); major depressive disorder; and opioid and cannabis use disorders." Tr. 1168. At step three, the ALJ found plaintiff's impairments, either singly or in combination, did not meet or equal the requirements of a listed impairment. *Id.*

Because he did not establish presumptive disability at step three, the ALJ continued to evaluate how plaintiff's impairments affected his ability to work. The ALJ resolved that plaintiff had the residual functional capacity to "perform a full range of work at all exertional levels" but with the following non-exertional limitations:

> no more than occasional interaction with the general public, coworkers, and supervisors. He can perform tasks that do not involve a specific production rate pace, such as assembly line work or an hourly production quota, and can deal with occasional changes in a routine work setting.

Tr. 1170. At step four, the ALJ determined plaintiff had no past relevant work. Tr. 1174. At step five, the ALJ concluded, based on the VE's testimony, that there were a significant number of jobs in the national economy plaintiff could perform despite his impairments, such as store laborer, auto detailer, and cleaner. Tr. 1175.

## DISCUSSION

Plaintiff argues the ALJ erred by improperly discrediting his subjective symptom testimony concerning the extent of his impairments.[3] Pl.'s Opening Br. 3–12 (doc. 15). When a claimant has

---

[3] Plaintiff's opening brief articulates a single "issue presented" – i.e., "[w]hether the ALJ failed to provide specific, clear, and convincing reasons for rejecting [his] subjective symptom testimony." Pl.'s Opening Br. 2-3 (doc. 15). However, embedded within that discussion on page 10, plaintiff asserts: "Because the ALJ made her substantial-gainful-activity finding without evaluating whether the work was performed under special conditions — despite her own contrary finding as to the closely comparable Juniper work — the step-one finding is not supported by substantial evidence." *Id.* at 10. Plaintiff then devotes one terse paragraph to the subject, but only as it relates to the ALJ's purported "credibility error." *Id.* As such, plaintiff failed to properly raise this issue. *See* *United States v. Kama*, 394 F.3d 1236, 1238 (9th Cir. 2005) (an issue generally deemed waived when the appellant does not "specifically and distinctly" raise it in their opening brief). Even presuming this matter was before the Court, plaintiff failed to carry his burden in regard to step one. Indeed, the hearing testimony on which plaintiff relies (along with his earning and medical

medically documented impairments that could reasonably be expected to produce some degree of the symptoms complained of, and the record contains no affirmative evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of . . . symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996) (internal citation omitted). A general assertion the claimant is not credible is insufficient; the ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (internal citation omitted). In other words, the "clear and convincing" standard requires an ALJ to "show [their] work." *Smartt v. Kijakazi*, 53 F.4th 489, 499 (9th Cir. 2022).

Thus, when formulating the RFC, the ALJ is not tasked with "examining an individual's character" or propensity for truthfulness and instead assesses whether the claimant's subjective symptom statements are consistent with the record as a whole. SSR 16-3p, *available at* 2017 WL 5180304. If the ALJ's finding regarding the claimant's subjective symptom testimony is "supported by substantial evidence in the record, [the court] may not engage in second-guessing." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (internal citation omitted). The question is not whether the ALJ's rationale convinces the court, but whether it "is clear enough that it has the power to convince." *Smartt*, 53 F.4th at 499.

At the December 2021 hearing, plaintiff testified that he was unable to work due to "problems with people" and the need to take daily naps. Tr. 50. Regarding the latter, he explained

---

records, as discussed in greater detail below) reveals he was working at substantial levels and that his symptoms improved with time and/or treatment. Tr. 1167–68, 1199; *see also* 20 C.F.R. §§ 404.1574(a), 404.1572(a).

his medications, which he started after the alleged onset date, slow, exhaust, and weigh him down, and that he sleeps poorly and at irregular hours. Tr. 35–37, 44–45, 50–53, 55–56, 66–67. Concerning the former, he testified that he was terminated from his job at Walmart as a night-shift manager in January 2020 after having a physical confrontation with a customer (although he "didn't get in trouble, because the customer put his hands on [plaintiff] first"). Tr. 45. Plaintiff, however, acknowledged that he started working again in June 2020 at an army supply store, but that work was intermittent due to the lack of demand: "it's off and on [because] there's really nothing to do." Tr. 41–42. In terms of daily activities, he described himself as "like a child" insofar as he did not do any "housekeeping chores" or help his spouse with their three-week-old twins beyond heating up milk: "she's come to the point that she does everything, unfortunately."[4] Tr. 53, 55-56. He stated that he does not contribute more because he is tired and he has "problems with [the twins] crying." Tr. 55–56. He did nonetheless report traveling by plane to visit his ailing mother and attending AA meetings in person several days per week. Tr. 56–58.

At the June 2025 hearing, plaintiff testified that he had been working full-time since the beginning of the year as a fabricator "building truck campers." Tr. 1191. But he endorsed missing approximately one half day per week because he "wake[s] up incredibly early in the morning, and by the time work starts, [he's] incredibly exhausted." Tr. 1198. He was working successfully around 10 other people and was also receiving one-on-one training. Tr. 1198–99. Prior thereto, plaintiff attended a PTSD residential treatment program for approximately one month, which he described as "helpful" in regard to his sleep.[5] Tr. 1197–98.

---

[4] Plaintiff has one other biological child, who was five at the time of the first hearing, and two stepchildren, then ages eight and ten. Tr. 59, 1190.

[5] Plaintiff was terminated prematurely from that program due to testing positive for marijuana. Tr. 1425–31.

Plaintiff additionally worked at substantial gainful levels for periods during 2023 and 2024, but characterized that work as either "accommodated" or "unsuccessful work attempts" due to problems "be[ing] around people" and absenteeism, which occurred "a lot more" than at his current job. Tr. 1192–94, 1199. He reported splitting with his wife in February 2024, and only had custody of his three young children every other weekend (usually "overnight for at least one night"). Tr. 1190–91.

The ALJ determined plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not consistent with the medical evidence and other evidence in the record." Tr. 1172-73. In particular, the ALJ cited to "the longstanding nature of the impairments and related symptoms, [plaintiff's] presentation to providers, and extensive engagement in work despite the alleged limitations." *Id.* The ALJ also found that plaintiff's contemporaneous reports to providers and activities of daily living—e.g., "being busy, attending recovery meetings, helping care for children in the home, going hiking or hunting, working, and grocery shopping alone"—undermined his testimony. Tr. 1173.

In regard to the ALJ's first rationale, "[l]ongstanding impairments existing during periods when a claimant was employed may undermine claims of disability." *Merrill v. Comm'r of Soc. Sec. Admin.*, 2026 WL 764676, at *4 (D. Ariz. Mar. 18, 2026) (citing *Ahearn v. Saul*, 988 F.3d 1111, 1117 (9th Cir. 2021)); *see also* *James W. v. Kijakazi*, 2023 WL 6891281, at *6 (D. Or. Oct. 19, 2023) (pre-alleged onset date work history was relevant to the claimant's unchanged symptoms complaints). Relatedly, work history from after the claimant's alleged disability onset date may be used to discount subjective symptom testimony. *See, e.g.*, *Marcus P. v. Comm'r, Soc. Sec. Admin.*, 2020 WL 5866323, at *3 (D. Or. Sept. 29, 2020).

As the ALJ accurately noted, the record contains evidence reflecting PTSD and fatigue symptoms well-prior to the adjudication period. Tr. 1172. For instance, plaintiff reported unusual fatigue dating back to 2008. Tr. 245. The 2014 Department of Veterans Affairs ("VA") rating decision reflected partial disability due to PTSD and alcohol abuse related to, amongst other things, "chronic sleep impairment [and] occupational and social impairment." Tr. 301–02. Further, during a May 2019 VA case management call, plaintiff "stated his PTSD is 'really bad' [so] he does not believe he should have to maintain employment," and sought a corresponding increase in his VA disability rating, despite the fact that he continued to work at Walmart through January 2020 and, according to plaintiff, only left that employment due to an altercation with a customer. Tr. 852.

And, while plaintiff attempted to minimize his work activity during the adjudication period prior to January 2025, the record reflects that he was working nearly full-time, in person, during periods of 2021, 2023, and 2024. Tr. 1066–67, 1075, 1345–47. While some of this work did not rise to substantial gainful levels, it may still be indicative of greater functional abilities than alleged—particularly in regard to plaintiff's testimony surrounding absenteeism and problems being around other people. *See* 20 C.F.R. § 404.1572(a) ("[s]ubstantial work activity is work activity that involves doing significant physical or mental activities . . . work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before"); *see also* *Bowen v. Kijakazi*, 2022 WL 2610242, at *1 (9th Cir. May 14, 2024) ("[a]n ALJ may consider any work activity, including part-time work, in determining whether a claimant is disabled") (citing *Ford v. Saul*, 950 F.3d 1141, 1156 (9th Cir. 2020)).

Turning to the ALJ's remaining rationales, "whether the alleged symptoms are consistent with the medical evidence" is a relevant consideration. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1040

(9th Cir. 2007). In that context, a claimant's presentation to and demeanor with treatment providers may show inconsistency with claims of disability. *Sherry P. v. Comm'r, Soc. Sec. Admin.*, 2024 WL 4345749, at *3 (D. Or. Sept. 30, 2024). Plaintiff's treatment providers generally observed him to be alert and oriented, with intact thought processes and cognition.[6] Tr. 307, 332, 335, 338, 345, 350, 353, 359, 384, 389, 451, 825, 866, 871, 878, 942, 950, 968, 978, 981, 984, 993, 996, 1005, 1014, 1021, 1030, 1046, 1059, 1062, 1064, 1066, 1081, 1086, 1106, 1138, 1140, 1142, 1144, 1148, 1150, 1152, 1155, 1161 1809–10, 1895, 1900, 1919, 1962. Likewise, plaintiff was observed to have a euthymic affect on many occasions, and even when he presented as dysthymic, anxious, frustrated, or suspicious, he was nevertheless able to behave in an appropriate manner. Tr. 307, 448, 825, 861, 866, 871, 1138, 1438–39, 1445, 1450, 1454, 1460, 1498, 1532, 1869, 1889, 1900, 1919, 1924, 1953, 1962. In fact, providers typically considered plaintiff to be cooperative and polite. Tr. 451, 874, 878, 906, 1061, 1064, 1097, 1100, 1138, 1148, 1150, 1155, 1454, 1498, 1535, 1590, 1635, 1684, 1738, 1775, 1809, 1812, 1895, 1900, 1928, 1953, 1962.

Specifically in regard to plaintiff's sleep issues, the record does contain consistent complaints of fatigue and/or problems with sleep early in the adjudication period. Tr. 299, 301–03, 306–07, 309, 323, 330, 332–33, 335, 337, 343, 348, 822, 858, 863, 865–66, 876–78, 882, 884–87, 889, 896, 901, 957, 988–89, 995, 1046, 1049, 1060, 1066, 1095, 1097, 1131, 1134, 1155, 1161, 1647, 1952, 1961. There are also a few references to plaintiff taking naps during the day. Tr. 333, 858, 877, 1066, 1095, 1778, 1873, 1952, 1961; *but see* Tr. 863 (plaintiff reporting in October 2020

---

[6] Plaintiff asserts that the prior remand order held "that observations of cognitive functioning during therapy sessions do not contradict [his] reported symptoms," but this characterization is not quite accurate. Pl.'s Opening Br. 6, 8 (doc. 15). Judge Kasubhai actually found that "the ALJ *fail[ed] to articulate*" the potential contradiction between plaintiff's claims and the provider observations. *Daniel G.*, 2024 WL 4182841, at *7 (emphasis added). Here, in contrast, the ALJ explained which symptom allegations were belied by plaintiff's presentation and behavior during treatment.

that "[h]e did take a nap yesterday but this is irregular"). Plaintiff, however, was dealing with additional situational stressors during 2020 and 2021 – including newborn twins, increased anxiety due to the COVID-19 pandemic, the death of his father, and transitioning from working the night-shift – and attributes some of his sleep difficulties thereto.[7] *See, e.g.*, Tr. 45, 330, 333, 450, 858, 1197, 1204.

Further, plaintiff discontinued therapy from May 2022 to August 2023, during which time he "stopped taking medications for about 3 months." Tr. 1936, 1947–49. Of plaintiff's discontinued medications, "quetiapine was helpful [for sleep] but made him too sleepy" to "get up with the babies at night." Tr. 1926–27. After reengaging with treatment, plaintiff was prescribed sertraline and risperidone, which he reported were "working better than the quetiapine" and led to him "sleeping okay." Tr. 1906, 1911. In fact, plaintiff reported in December 2023 that he was sleeping for about 9 hours nightly. Tr. 1917. In March 2024, plaintiff was "sleeping more" at night and denied feeling "sleepy" during the day, just "tired." Tr. 1898.

Although plaintiff experienced heightened symptoms in the course of separating from his spouse in early 2024, later that year he obtained in-patient treatment for his sleep disorder (which he described as beneficial) and, as discussed immediately below, the record otherwise suggests that he was able to engage in a wider slate of daily activities as the adjudication period went on. Tr. 1173, 1482, 1490, 1498–99, 1503–04, 1561–62, 1577, 1589, 1649–50, 1726, 1730, 1733, 1774, 1777–78, 1817, 1823–24, 1835, 1838, 1849, 1859, 1868, 1873, 1880–81, 1903.

Indeed, "[e]ven if the claimant experiences some difficulty or pain, [their] daily activities may be grounds for discrediting the claimant's testimony to the extent that they contradict claims

---

[7] There is also evidence that plaintiff briefly obtained in-patient treatment the month he stopped working at Walmart due to "Opioid Withdrawal, PTSD, and Unspecified Psychosis." Tr. 301, 384, 937. He left that program due to "not being able to smoke and . . . not lik[ing] the food." Tr. 301.

of a totally debilitating impairment." *Smartt*, 53 F.4th at 499 (citation and internal quotations omitted). Substantial evidence supports the ALJ's conclusion as to this issue. Namely, in May 2020, plaintiff was 40 minutes late for a telehealth appointment because he had "been busy," and terminated the call early "to go run after his 3 kids." Tr. 882–83. In July 2021, plaintiff "could not remain on [a] call" with a treatment provider "because he was watching his daughters." Tr. 1065–66. As of March 2021, he started his day by "setting out clothes for the kids, and cooking breakfast." Tr. 1095. Plaintiff thus engaged in a more robust slate of childcare activities than endorsed at his first hearing and, certainly by 2024, he was independent in his ability to provide care and parent three young children while working nearly full time. Tr. 1190–91; *see also* *Workman v. Berryhill*, 2017 WL 4780610, at *9 n.9 (D. Or. Oct. 23, 2017) (ALJ properly relied upon claimant's childcare activities to discredit her subjective complaints where, distinguishing *Trevizo*, the record provided details as to what the claimant's childcare activities involved, including evidence that the claimant was the only individual who cared for her two children and that she fed, clothed, and changed them).

The record also reflects that plaintiff attended AA meetings "several days a week" and stayed in touch with his sponsor "almost daily[,]" which the ALJ found "suggest[ed] a greater tolerance for contact with others than alleged." Tr. 438, 866, 882, 885, 889, 1059, 1064, 1101, 1150, 1160, 1173. Moreover, he hunted coyotes and cougars (sometimes with a friend), and hiked three to four times per week. Tr. 37–39, 69, 438, 856–57, 863, 886, 1107, 1129, 1155, 1540, 1631, 1738, 1742–43. Plaintiff also took a day trip with his daughter in mid-2024. Tr. 1833. During the same time period, he was late to a teletherapy session due to "needing to provide transportation to [his] children unexpectedly." Tr. 1876. Additionally, plaintiff attested to sleeping at a friend's house at various points in 2024. Tr. 1883, 1885, 1906.

The ALJ reasonably inferred from the aforementioned activities that plaintiff's functional abilities were greater than alleged. *See Febach v. Colvin*, 580 Fed.Appx. 530, 531 (9th Cir. 2014) (ALJ is not required to accept a claimant's attempt to characterize activities as consistent with disability where those activities "could also reasonably suggest" greater functional abilities) (citing *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004)). In sum, the ALJ provided legally sufficient reasons, supported by substantial evidence, for affording less weight to plaintiff's subjective symptom testimony.

**CONCLUSION**

For the reasons stated above, the Commissioner's decision is affirmed, and this case is dismissed.

IT IS SO ORDERED.

DATED this 26th day of October, 2026.

/s/ Jolie A. Russo
Jolie A. Russo
United States Magistrate Judge